Filed 4/29/26  P. v. Vargas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084647 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN124090) |
| CARLOS GREGORIO VARGAS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Daniel F. Link, Judge.  Affirmed.

Sabrina R. Damast, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Senior Assistant Attorney General, Daniel Rogers, Supervising Deputy Attorney General and Adrian R. Contreras, Deputy Attorney General for Plaintiff and Respondent.

Carlos Gregorio Vargas appeals an order denying his motion under Penal Code section 1473.7[1] to vacate his 2001 guilty plea to one count of continuous sexual abuse of a child (§ 288.5). Finding the hearing testimony of Vargas's former attorney credible and observing there was no immigration-safe plea available to Vargas, the superior court ruled that while Vargas showed he clearly had ties to the United States, he had not proven his counsel failed to properly advise him of his plea's immigration consequences. Vargas contends the court erred by not acknowledging the plea form's inadequate immigration advisals, and while it correctly acknowledged his strong ties to the U.S., it incorrectly treated the lack of an immigration-safe alternative plea as determinative of the prejudice analysis. We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

*Vargas's Charges and Guilty Plea*

Between 1998 and 2000, Vargas had numerous sexual encounters with his niece beginning when she was 12 years old and he was between age 19 and 21. Vargas was arrested in 2001. He did not have a prior criminal record.

In 2001, the district attorney charged Vargas with one count of continuous sexual abuse of a child and three counts of committing a lewd act upon a child (§ 288, subd. (a); counts 2-4). On May 8, 2001, Vargas pleaded guilty to the count 1 charge.[2] The form indicates the district attorney would dismiss the remaining balance of charges, but otherwise offered "[n]o deals." Vargas checked a box on the plea form stating: "I understand that if I am not

---

[1] Undesignated statutory references are to the Penal Code.

[2] Though a court reporter was present at the plea hearing, the transcript is not in the appellate record.

a U.S. citizen, this plea of Guilty/No Contest may result in my removal/deportation, exclusion from admission to the U.S. and denial of naturalization.  Additionally, if this plea is to an 'aggravated felony' listed on the back of this form, then I **will** be deported, excluded from admission to the U.S., and denied naturalization." (Some capitalization omitted.)  The plea form attached a list of aggravated felonies, which included "sexual abuse of a minor (touching is not required, e.g.: indecent exposure.)" (Some capitalization omitted.)  Vargas initialed and signed below a statement declaring under penalty of perjury that he had "read, understood, and initialed" the above items and "any attached addendum . . . ."  Vargas's counsel at the time signed a form provision stating he had "personally read and explained to [Vargas] the entire contents of this plea form and addendum thereto," "discussed [with him] all charges and possible defenses . . . , and the consequences of this plea, including any immigration consequences," and "personally observed [Vargas] . . . read and initial each item to acknowledge [his] understanding and waivers."  The provision indicated counsel concurred in Vargas's plea.

In a jail interview for his probation report, Vargas admitted he committed the acts against his niece, and stated he was willing to comply with all probation terms and conditions.  As to his background, Vargas stated he was born in Mexico City but moved to the U.S. early in his life.  He thought he had a green card and was in the country legally; Vargas worked jobs at golf equipment companies in the U.S. starting in 1996 until 1998, then worked six months as a driver for a clothing company and another six months in the warehouse for another company.  He had been at his latest job as a machine operator one month when he was arrested.  Vargas had a five-year-old child living in Mexico from a relationship he had had with his aunt.  He

3

lived in California with his mother, partner/girlfriend and their child. His stated future plan was to remain in San Diego and return to school to get certified as an automotive technician.

Vargas received five years of probation and a 365-day county jail sentence.[3]

*Vargas's Section 1473.7 Motion to Vacate His Conviction*

In 2024, Vargas moved to vacate his conviction under section 1473.7. He asserted that at the time of his guilty plea, he was not properly advised by his attorney that entering the plea would affect his immigration status and result in deportation, denial of naturalization or citizenship, and denial of reentry into the U.S. He argued his counsel did not advise him on the consequences of his plea or the legal recourses available to him. Vargas claimed he took his attorney's advice but did not understand the nature of the charges against him, and thus accepted the plea.

---

[3] Federal law "renders deportable any alien convicted of an 'aggravated felony' after entering the United States. [Citation.] Such an alien is also ineligible for cancellation of removal, a form of discretionary relief allowing some deportable aliens to remain in the country. [Citation.] Accordingly, removal is a virtual certainty for an alien found to have an aggravated felony conviction, no matter how long he has previously resided here." (*Sessions v. Dimaya* (2018) 584 U.S. 148, 153; see *People v. Carrillo* (2024) 101 Cal.App.5th 1, 15 ["A noncitizen convicted of an aggravated felony at any time after admission is conclusively presumed deportable and is subject to mandatory deportation and permanent exclusion from the United States"].) An aggravated felony is "a term defined to include, among other offenses, 'sexual abuse of a minor'" under Title 8 United States Code sections 1101(a)(43)(A) and 1227(a)(2)(A)(iii). (*Mero v. Barr* (9th Cir. 2020) 957 F.3d 1021, 1022; see also *United States v. Baron-Medina* (9th Cir. 1999) 187 F.3d 1144, 1147 [conviction under section 288, subdivision (a) constitutes an aggravated felony under Title 8 United States Code section 1101(a)(43)(A)].) Vargas concedes that "[a]n aggravated felony is . . . a bar to cancellation of removal for lawful permanent residents, asylum, and a bar to naturalization."

4

Vargas submitted a declaration in support of the motion. He stated he came to the U.S. at age 10, and was a legal permanent resident until his deportation following his release for his conviction, which he suffered when he was 23 years old. Vargas stated he and his partner had recently decided he should seek legal immigration status, and in March 2023, began contacting attorneys to understand his options. He learned that his conviction placed him in a position to be deported but also prevented him from entering the U.S., and there was no possible exception or waiver. Vargas reiterated that at the time of his plea, his attorney did not ask about his immigration status, did not notify him he could be deported for his plea, and did not "properly discuss" the deportation, exclusion, or denial of naturalization consequences of his plea. He also stated that in 2001, he was a permanent U.S. resident, had lived here for a decade, and had set up "deep roots" here, as his daughter, a U.S. citizen, was a few months old when his criminal proceedings began. He stated his entire immediate family was in the U.S.

According to Vargas, had he been aware of the immigration consequences and known he would be deported and barred from ever entering the U.S. or later obtaining legal status, he would not have accepted the plea; he would have accepted a longer sentence in exchange for an immigration-safe plea. In support of the motion, Vargas submitted a letter from his partner/girlfriend, as well as his probation report.

The People opposed the motion. They argued Vargas was properly advised of the immigration consequences of his plea at the time, and he did not present sufficient evidence to prove prejudicial error under the applicable preponderance-of-the-evidence standard. Specifically, they argued Vargas, who had been deported shortly after his conviction and started a

5

transportation business in Mexico, where he had lived for 20 years, "had minimal ties to the United States at the time of his plea, his main priority in plea bargaining was not immigration consequences but was avoiding custody, and he had no other plea offers or reason to believe there existed an immigration-neutral charge to which he could plead." They characterized Vargas's declaration as self-serving, containing "general" statements unsupported by contemporaneous evidence. The People argued Vargas "failed to provide any evidence to show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial; especially when he faced four felony counts, each of which had presumptive prison sentences, with upper terms of 16 years and 18 years, and each rendered him both deportable pursuant to [Title 8 United States Code section 1227(a)(2)(A)(iii)] and inadmissible pursuant to [Title 8 United States Code section 1227(a)(2)(A)(i)]."

*The Hearing*

The court conducted an evidentiary hearing on the matter at which Vargas's plea counsel and Vargas testified.[4] Vargas's plea counsel testified he had been an attorney for 41 years and had practiced criminal defense exclusively since 1987. He testified that if a client had a Latin surname, then one hundred percent of the time before entering a change of plea he would inquire about their residence status—whether they were a U.S. citizen, permanent resident or undocumented—to make sure he knew what it was. He testified he would not enter a change of plea, especially on a case

---

[4] The trial court waived Vargas's attorney-client privilege for the hearing. Vargas does not challenge that ruling on appeal. Nor does this appeal raise any issues about Vargas's eligibility for section 1473.7 relief such as the timeliness of his motion. (§ 1473.7, subd. (b)(2); *People v. Alatorre*, *supra*, 70 Cal.App.5th at pp. 766-767.)

6

involving child molestation, without an immigration discussion with the client. He also "100 percent without exception" would go over the immigration advisal on the change of plea form before they would change their plea. Counsel knew that a section 288 charge specifically would lead to deportation; he did not need an immigration attorney to tell him that section 288, subdivision (a) and 288.5 offenses would be considered crimes involving moral turpitude, and serious offenses under the immigration code. He testified that his practice in 2001 was no different. Counsel only vaguely remembered Vargas's case, but reviewed a psychology report he arranged to have prepared that indicated Vargas was born in Mexico.[5] Based on counsel's review of his case file, he was aware of Vargas's immigration status before entering his change of plea. He testified the psychologist's report "was almost conclusive evidence that it would have triggered an immigration discussion with Mr. Vargas prior to his pleading guilty"; nothing suggested he would not have advised Vargas that pleading to a section 288.5 offense would not be a deportable offense.

Counsel testified that he personally handled every case, and based on the addendum to the plea form listing aggravated felonies, he would have explained that pleading guilty to such felonies, which included sexual abuse of a minor, would result in that person's deportation. Based on the four

_____

[5]     That March 2001 report by Lynette Rivers, Ph.D., was prepared to address Vargas's current level of cognitive and psychological functioning as well as to determine his level of risk to the community. Dr. Rivers reported that Vargas, then 22-years-old, was "quite proficient in the English language," as he had begun speaking it in 1987. Vargas told Dr. Rivers that once released from custody he wished to return to work and go back to his family. Dr. Rivers determined that Vargas had no intellectual deficits and was not suffering from any major mental illness, and he did not meet the diagnostic criteria for a personality disorder. She stated he "used very poor judgment" in committing the acts.

charges in Vargas's case—one under section 228.5 and three under section 288, subdivision (a)—there was no possible immigration-safe plea he could have negotiated for Vargas, particularly in light of the statement on the plea form that the district attorney had made "no deals" as to the contemplated sentence. Counsel stated Vargas's exposure was 16 years in state prison. He stated generally when the prosecutor gave you a "no deals offer," that would mean they do not consider a lesser plea. "And particularly on these type of cases of [section 288 offenses], you're just not going to get a better offer, especially in light of that charge unless there's some substantial weakness in the prosecution case. But again, her stating no deals would have told me that they weren't willing to come down to any other plea."

Vargas testified that he came legally to the U.S. in 1989 when he was around 10 years old. His father was a legal resident, and Vargas got a green card. He attended third through sixth grades in the U.S., went to school in Mexico for eighth and ninth grades while visiting there, then moved back to the U.S. in 1995 or 1996. He started working and received his general education development credential from a community college. Vargas got his first job when he was 17 years old at a golf equipment manufacturing company and planned to get state and federal certifications as an automotive technician. He lived with his girlfriend and mother. Vargas was employed when he was arrested. In 2001, his mother, father, brother and sister lived in Oceanside, and they lived in the U.S. at the time of the hearing. Vargas's partner lived in Oceanside but visited him sometimes in Tijuana or Mexico City. He had a 24-year-old daughter living in Seattle, Washington.

Vargas testified that his plea attorney visited him about five times while he was in custody. He did not recall being told "anything about immigration," but recalled counsel told him the plea was the best deal he

8

could get and that he should sign the papers. Vargas testified "[i]t was a great deal, so I did sign all the paperwork, like, obviously I didn't have time to read through the whole thing, so I just signed and initialed the whole thing and give [*sic*] the packet back to [the attorney] . . . ." He testified that if he had meaningfully understood that entering into the plea would necessarily result in his deportation, he would not have entered into it; and he had no reason to believe he would face immigration consequences because he was legally in the U.S. After immigration officials visited him, he contacted the attorney, who told him immigration law was not his area of practice and that Vargas should contact an immigration attorney. Vargas testified that he wanted very badly to return to the U.S. to be close to his family.

*Court's Ruling*

After considering the parties' arguments, the court denied Vargas's motion. It observed that unlike cases cited by Vargas's counsel such as *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), there were no immigration-safe pleas available to Vargas. The court found Vargas's former attorney "extremely credible and honest," and observed he specifically said his habit and custom was to always make his clients aware of immigration consequences. The court stated it was not denying Vargas's motion based on his ties to the U.S., but on Vargas's inability to "convince this court beyond a preponderance that [he] wasn't properly instructed." "And based on [Vargas's former counsel's] testimony here today, based on the change of plea form, based on the fact that I've taken judicial notice that there was no interpreter present because ostensibly there was no indication that [Vargas] did not understand English. He read English. . . . So therefore, it's my understanding [Vargas] understood the English language; and therefore, his signature and his initials are on there. He avoided prison." The court

9

observed that Vargas's plea based on the charges was "an extremely, extremely good deal for [him] at the time." The court concluded: "I do believe [Vargas] knew what the immigration consequences were; and ultimately, I don't believe, based on his testimony today, that his memory is good enough to overcome the testimony that I heard today, plus the evidence that's been presented."

Vargas filed this appeal.

## DISCUSSION

### I. *Legal Principles*

The Legislature enacted section 1473.7 to " 'create[ ] an explicit right for a person no longer imprisoned or restrained' " to have their conviction or sentence vacated "upon a showing, by a preponderance of the evidence, of 'prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere.' [Citation.] A finding of prejudicial error under this provision may, but need not, be based on ineffective assistance of counsel. [Citation.] If the motion is meritorious, 'the court shall allow the moving party to withdraw the plea.' " (*Vivar, supra*, 11 Cal.5th at p. 523, citing § 1473.7, subds. (a)(1), (e)(1), (e)(3).)

"To prevail under section 1473.7, a defendant must demonstrate that his conviction is 'legally invalid due to prejudicial error damaging [his . . .] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.' (§ 1473.7, subd. (a)(1).) The defendant must first show that he did not meaningfully understand the immigration consequences of his plea. Next, the defendant must show that his misunderstanding constituted prejudicial error. '[P]rejudical error . . . means demonstrating a reasonable

10

probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.' " (*People v. Espinoza* (2023) 14 Cal.5th 311, 319; see also *People v. Benitez-Torres* (2025) 112 Cal.App.5th 1252, 1255.)

"Whether counsel's advice regarding immigration was inadequate and whether such inadequacy prejudiced the defense, while mixed questions, are predominantly questions of law." (*Vivar, supra*, 11 Cal.5th at p. 524.) Hence, we review the court's ruling independently, "consistent with section 1473.7's purpose: to offer relief to those persons who suffered 'prejudicial error' but are 'no longer imprisoned or restrained' and for that reason alone are unable to pursue relief on habeas corpus." (*Id*. at p. 525; *People v. Alatorre* (2021) 70 Cal.App.5th 747, 755.) Under this standard, " 'an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' [Citation.] When courts engage in independent review, they should be mindful that ' "[i]ndependent review is *not* the equivalent of de novo review . . . ." ' [Citation.] An appellate court may not simply second-guess factual findings that are based on the trial court's own observations." (*Vivar*, at p. 527.) We should give "particular deference to factual findings based on the trial court's personal observations of witnesses." (*Id*. at pp. 527-528.)[6] "Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Id*. at p. 528; *Alatorre*, at p. 767.)

---

[6] Where "the facts derive entirely from written declarations and other documents, however, there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, '[t]he trial court and [the reviewing] court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding." (*Vivar, supra*, 11 Cal.5th at p. 528.)

11

## II. *Vargas Has Not Shown Error Affecting His Ability to Understand the Immigration Consequences of His Plea*

Importantly, the court in this case reached its ruling after considering the live testimony of Vargas's plea counsel and Vargas, who appeared via an online application without the need for an interpreter. The court made credibility findings about their testimony, to which we must defer. (*Vivar*, *supra*, 11 Cal.5th at pp. 527-528; *People v. Espinoza*, *supra*, 14 Cal.5th at p. 320.) These findings distinguish this case from others, including *Vivar* and *Espinoza*, in which the appellate courts considered a "cold" record consisting of declarations and documentary evidence, and thus were in as good a position as the trial court to decide the moving party's right to section 1473.7 relief. (See *Vivar*, at p. 528; *Espinoza*, at p. 320 [trial court conducted no evidentiary hearing, thus there was "no basis for deference"]; *People v. Carrillo*, *supra*, 101 Cal.App.5th at p. 14 [superior court's factual findings were "derived entirely from documents"].)

To reiterate, to obtain section 1473.7 relief, Vargas was required to demonstrate by a preponderance of the evidence his "conviction or sentence is legally invalid due to prejudicial error damaging [his] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1).) He thus "must first show that he did not meaningfully understand the immigration consequences of his plea." (*People v. Espinoza*, *supra*, 14 Cal.5th at p. 319.) The focus of the inquiry is Vargas's " ' "own error in . . . not knowing that his that his plea would subject him to mandatory deportation and permanent exclusion from the United States." ' " (*People v. Padron* (2025) 109 Cal.App.5th 950, 958; *People v. Alatorre, supra,* 70 Cal.App.5th at p. 769 [key to section 1473.7 is the defendants " 'mindset' "

12

and " 'what he or she understood—or didn't understand—at the time the plea was taken' "]; *People v. Mejia* (2019) 36 Cal.App.5th 859, 866.) But "[a] defendant seeking to set aside a plea must do more than simply claim he did not understand the immigration consequences of the plea. The claim must be corroborated by evidence beyond the defendant's self-serving statements." (*People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 664; *Vivar, supra*, 11 Cal.5th at p. 530 ["we have long required the defendant corroborate such assertions with ' "objective evidence" ' "]; *Espinoza*, at p. 321.)

Here, the court found Vargas did not make this showing, accepting the credibility of his plea counsel's testimony that he knew Vargas was born in Mexico having reviewed Vargas's psychological report indicating such, and because the case involved section 288.5 and 288 offenses, he always without exception would go over the immigration advisal on the change of plea form. Counsel stated that he knew Vargas's offenses were crimes of moral turpitude that would lead to deportation. As counsel testified, Vargas's psychologist's report "was almost conclusive evidence that it would have triggered an immigration discussion with Mr. Vargas prior to his pleading guilty." The court reasonably concluded based on the notations on Vargas's plea, as well as his plea counsel's testimony and Vargas's proficiency in English, that Vargas meaningfully understood he would be subject to mandatory deportation as a result of his plea.

Conversely, the court discredited Vargas's testimony that he did not recall his counsel telling him anything about immigration, or that he would not have entered into his plea had he known deportation was mandatory. Vargas did not provide objective evidence to corroborate his assertions, as he must. (*Vivar, supra*, 11 Cal.5th at p. 530; *People v. Espinoza, supra*, 14 Cal.5th at p. 321.) For example, Vargas did not produce evidence that he

13

engaged in post-conviction conduct substantiating his claimed mindset; rather, the evidence was that after his deportation, Vargas did not seek relief for years. This is unlike the defendant in *Vivar*, who promptly sought relief just a month after his plea, writing "uncounseled" letters to the court objecting to an immigration hold. (*Id*. at pp. 530-531.) Those actions were contemporaneous evidence that avoiding deportation was important to the *Vivar* defendant. (See also *People v. Espinoza, supra*, 14 Cal.5th at p. 320 [defendant started his own business and joined community organizations, becoming well known in his local community, and flew internationally to the U.S., subjecting himself to U.S. immigration scrutiny, an act that "is not consistent with the behavior of a person who understood that his convictions effectively ended his lawful resident status"]; *People v. Alatorre, supra*, 70 Cal.App.5th at p. 770 [evidence showed defendant never appreciated his plea made him automatically deportable, as he took "misguided efforts to become a naturalized citizen within three years of his conviction that brought him to the attention of immigration authorities and triggered his own deportation. . . . [S]omeone who understood his criminal conviction made him automatically deportable would not voluntarily contact immigration authorities and advise them of his presence in the country"].) Though Vargas points out he reported to the psychologist he looked forward to returning to work in the U.S., he made this statement *before* entering into his plea.

Vargas points to his plea form's statement that if he were not a U.S. citizen, his conviction "may result" in deportation or other immigration consequences. Asserting that a section 288.5, subdivision (a) offense "may" be an aggravated felony or crime of moral turpitude carrying mandatory inadmissibility or deportation consequences, he argues the advisement on the plea form was invalid because it did not convey the mandatory immigration

14

consequences of his plea. According to Vargas, the fact the plea form also stated that an aggravated felony *will* trigger the specified immigration consequences does not matter, because the plea form's listing of crimes is an "inaccurate oversimplification" of the crimes falling under this category. Vargas acknowledges his plea attorney's testimony, but argues that even taking that into consideration, he reasonably did not meaningfully understand the immigration consequences given the "contradictory information" from the plea form. Thus, he argues, the totality of the circumstances and the contradictory information prevented him from understanding, accepting and defending against the immigration consequences of his plea.

We are not convinced that the plea form contradicts counsel's advisement, or that it does not reflect the mandatory nature of the immigration consequences of Vargas's plea. Even if we accept arguendo Vargas's argument that some of the unrelated offenses listed on the plea form addendum do not qualify as aggravated felonies, the offense to which Vargas pleaded guilty—continuous sexual abuse of a minor—qualifies as one, as it involves sexual abuse of a minor. (See footnote 3, *ante.*) Vargas's arguments disregard the "particular deference" (*Vivar, supra*, 11 Cal.5th at pp. 527-528) we must give to the court's credibility determinations after having personally observed Vargas and his plea counsel testify. The court found unreliable Vargas's recollection about whether his plea counsel properly advised him of the immigration consequences of his plea, and ultimately did not believe him. (See, e.g., *People v. Lopez* (2018) 5 Cal.5th 339, 352 [" 'a failure to remember aspects of the subject of the testimony' " presents a question " 'of credibility for resolution by the trier of fact' "].) It believed counsel's unequivocal

15

statement that given the nature of Vargas's offenses, he would have advised Vargas that pleading guilty to such felonies *would result* in his deportation.

Based on our independent review of the record, and giving the required deference to the trial court's credibility determinations, we conclude Vargas has failed to establish by a preponderance of evidence he did not meaningfully understand the immigration consequences of his plea at the time he entered into it.

## III. *Prejudice*

Though we need not do so, we touch on the issue of prejudice. Prejudice in this context is "a reasonable probability that [the moving party] would have rejected the plea if [he] had correctly understood its actual or potential immigration consequences." (*Vivar, supra,* 11 Cal.5th at p. 529; *People v. Alatorre, supra,* 70 Cal.App.5th at p. 770; see also *People v. Padron, supra,* 109 Cal.App.5th at p. 959.) " 'A reasonable probability does not mean more likely than not. [Citation.] Instead, it means merely a reasonable chance, which is more than an abstract possibility . . . . In other words, a reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*Padron,* at p. 959, quoting *People v. Carrillo, supra,* 101 Cal.App.5th at p. 19.) We look at "the totality of the circumstances," including "the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar,* at pp. 529-530.)

It is apparent that Vargas had family and work ties to the U.S. But there is little indication other than Vargas's own statements that at the time of his plea it was important to him to avoid deportation, and there is no

16

evidence of Vargas's intent in obtaining a plea bargain other than to get "a great deal." There is little to no objective evidence to substantiate Vargas's testimony concerning his willingness to enter into the plea. (*People v. Espinoza*, *supra*, 14 Cal.5th at p. 321 [a defendant must provide "objective evidence" corroborating factual assertions].) Though Vargas had no prior criminal record, the prosecutor in his case made clear in the plea that the People were giving "no deal[s]." While "a defendant without an extensive criminal record may persuasively contend that the prosecutor might have been willing to offer an alternative plea without immigration consequences" (*Espinoza*, at p. 324), Vargas cannot make this argument on this record. He did not present evidence from an immigration attorney about possible alternative offenses without deportation consequences. (Compare, *Espinoza*, at p. 324.) To the contrary, his plea counsel could not think of such alternatives. Particularly in a case where Vargas admitted engaging in the unlawful acts, we cannot say the record supports any assertion that Vargas had reason to expect or hope for a plea bargain without immigration consequences or would have gone to trial, so as to "enhance[ ] the 'credibility of [his] claim' that he 'would have rejected the plea bargain' had he been properly advised." (*Ibid*.)

## DISPOSITION

The order is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

DATO, J.

DO, J.